JENNIFER GOETHE,

        Plaintiff,

    v.

VILLAGE OF GLENWOOD,

        Defendant.

No. 15 CV 7459

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Jennifer Goethe worked at a golf club owned by defendant Village of Glenwood. After she complained that her managers had given her less desirable assignments because of her race, she found herself working fewer hours and short-staffed shifts. She brought this action *pro se*, alleging both race discrimination and retaliation by her employer in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Both parties move for summary judgment. For the following reasons, Goethe's motion is denied, and the Village's motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no

genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). And on cross-motions for summary judgment, a court must draw inferences "in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008).

## II.    Background

The Village filed its motion for summary judgment, memorandum in support, and a Local Rule 56.1 statement of material facts, along with several affidavits and Goethe's deposition transcript. *See* [32]–[34].[1] In compliance with Local Rule 56.2, the Village also filed a document titled "Notice to Pro Se Litigant Opposing a Motion for Summary Judgment," which explains that responding to such a motion requires compliance with Federal Rule of Civil Procedure 56 and Local Rule 56.1. *See* [35]. Local Rule 56.1(b)(3)(B) provides that a party opposing a motion for summary judgment must respond to each of the numbered paragraphs in the moving party's statement of material facts, and in the case of a dispute, she must provide "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Goethe did respond to the Village's statement of material facts and to each of the numbered paragraphs therein. *See* [39]. In some of those individual responses, she cited to relevant testimony from her deposition to

---

[1] Bracketed numbers refer to entries on the district court docket.

explain how an assertion was in dispute. But most of her responses are argumentative and either cite to evidence that does not controvert the asserted fact or do not refer to any admissible evidence in the record at all.

The Village requests that Goethe's response to its statement of material facts be struck in its entirety for failing to comply with the local rules. Goethe acknowledged that she had to comply with the procedural requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1 when she requested an extension of time to respond to the Village's motion. [37] at 1. That motion was granted, [38], and when Goethe filed her cross-motion and response more than two weeks after the new deadline, the delay was excused. [42]. Courts are entitled to expect compliance with federal and local procedural rules, even from *pro se* plaintiffs such as Goethe. *See McNeil v. United States*, 508 U.S. 106, 113 (1993); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009). But as a general rule, courts liberally construe a *pro se* plaintiff's pleadings, giving her "a break when, although [she] stumbles on a technicality, [her] pleading is otherwise understandable." *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998)). Goethe's response will not be struck in its entirety. Rather, the facts submitted by the Village that are supported by the record and not properly controverted by Goethe are deemed undisputed.[2] The relevant undisputed facts follow.

---

[2] Goethe also filed with her response several printouts of what look like emails, text messages, and websites, as well as two statements signed by nonparties Cheryeea Henry and Adam Winston. *See* [39] at 28–43. One of those statements is entitled "affidavit," but neither is notarized, and neither contains an attestation of its truth such that it could have

Goethe is African American and began working for the Village on September 6, 2013, as a part-time banquet bartender and server at the Glenwoodie Golf Club, which is owned by the Village. [39] ¶¶ 3–4. The Glenwoodie bar manager, Maureen Durkin, hired Goethe and, along with the Glenwoodie general manager Tim Donohoe, supervised her work.[3] [39] ¶¶ 5–6. As a banquet bartender and server, Goethe worked at large events with up to 350 guests. [39] ¶ 7. Her responsibilities as bartender included opening the bar, ensuring that it was properly stocked, preparing and serving drinks, handling cash, cleaning glassware and the bar area, and mopping the floor. [39] ¶ 7. When she worked as a banquet server, she had to set up tables, prepare and carry food, clear the tables, operate the dishwasher, and put away the silverware. [39] ¶ 7.

In April 2014, Goethe began working at the Glenwoodie clubhouse bar and operating a beverage cart, in addition to her banquet assignments. [39] ¶ 8. Her clubhouse bar assignments required more cleaning work than her banquet bar assignments, and they involved more repeat customers who demanded individual attention. [39] ¶¶ 9, 14. She also had to ring up all of her sales at the clubhouse bar,

---

the effect of an affidavit under 28 U.S.C. § 1746, despite explicit instructions in the Local Rule 56.2 notice to include such an attestation. The Village requests that all of those documents be disregarded, because they were not disclosed in discovery, were not cited in Goethe's response, and constitute inadmissible hearsay. That request is granted, and I do not consider those documents. Even if I did consider them, Goethe does not explain how they could be used to dispute any of the Village's asserted facts which are material to its motion. She did not incorporate them into a Local Rule 56.1(b)(3)(C) statement of additional facts in response to the Village's motion or a Local Rule 56.1(a)(3) statement of facts in support of her own motion—she did not file such statements—and she did not explain how these exhibits support the denial of the Village's motion for summary judgment or the granting of her own.

[3] Donohoe stopped working at Glenwoodie in July 2015. [39] ¶ 6.

whereas the banquets she worked typically included an open bar. [39] ¶ 16. Her beverage cart assignments involved stocking a cooler attached to a golf cart, driving the cart around the golf course, and selling drinks and candy to golfers. [39] ¶¶ 26–28. She also had to fill out paperwork and receipts for the sales she made. [39] ¶ 22. Goethe received written instructions and in-person training for those new duties. [39] ¶ 22.

Durkin and Donohoe stated in affidavits that, once Goethe began working her new shifts, they received complaints from clubhouse bar patrons about Goethe's slow service and poor attitude. [39] ¶¶ 15, 17. Donohoe stated in an affidavit that he thought Goethe was too slow to work at the clubhouse bar after observing her letting dirty dishes pile up, making customers wait to be served, and taking too long to ring up sales. [39] ¶ 16. Donohoe also stated that on one occasion, he saw her talking to and reading magazines with her boyfriend for ninety minutes while ignoring clubhouse bar patrons. [39] ¶ 19. Donohoe criticized her work on the beverage cart, as well. He stated in his affidavit that Goethe's sales on the golf cart were low relative to other employees. [39] ¶ 23. And he said that on May 17, she improperly recorded cash transactions as credit card purchases. [39] ¶ 24.

On May 30, 2014, Goethe and another employee worked the beverage cart during an open-bar event for the Homewood Police Association. [39] ¶ 25. Goethe arrived to work ten minutes late without informing her supervisor. [39] ¶ 26. After stocking her cart, she began her route through the nine holes of the golf course to which she was assigned. [39] ¶ 26. But by the third hole, she ran out of one

particular brand of beer that the golfers had been requesting, so she returned to the clubhouse kitchen to search for cold beer with which to restock her cart. [39] ¶ 26. Donohoe saw her return to restock the cart three times within the first couple of hours of the event and, given the cart cooler's 240-drink capacity, he assumed that she had not properly stocked her cart. [39] ¶ 27. While waiting for Goethe to return with more beer, several golfers complained to her supervisors about her delay and her attitude. [39] ¶¶ 28–30. In addition, the event coordinator from the Village of Homewood relayed to a Glenwoodie manager several complaints she had compiled from golfers and other people on the course. [39] ¶¶ 28–30. Durkin and another manager told Goethe that golfers had complained, and Goethe approached one group of golfers to discuss their complaint. [39] ¶¶ 28–30. When Donohoe was told that Goethe had confronted golfers who had complained about her, he sent her home early, telling her that he had received too many complaints, and that he would meet with her to discuss her performance two days later on Sunday, June 1. [39] ¶¶ 30–31. Durkin replaced her on the beverage cart for the remainder of Goethe's shift. [39] ¶ 31.

The next day, on May 31, Goethe worked the beverage cart again. [39] ¶ 32. Again, Donohoe received complaints from golfers about Goethe's attitude and lack of service. [39] ¶¶ 32–33. At the end of her shift, Donohoe noted that Goethe's sales records and cart inventory did not match, and that Goethe had no credit card sales for the day. [39] ¶¶ 34–35. He also stated in his affidavit that Goethe had blamed her lack of credit card transactions on the fact that the mobile device used to

conduct those sales had a dead battery, but that the device had been fully charged when he checked.[4] [39] ¶ 35. He believed that Goethe did not offer golfers the option to pay with a credit card because it was harder to leave a tip on a credit card payment, and because credit card transactions required more paperwork at the end of her shift. [39] ¶ 35. According to his affidavit, by the end of the day, Donohoe decided that Goethe should no longer be scheduled for beverage cart or clubhouse bar shifts. [39] ¶ 38. At that time, Goethe had not made any complaints of race discrimination. [39] ¶ 39.

On June 1, Goethe met with Donohoe, Durkin, and a Village Trustee, Carmen Hopkins. [39] ¶ 40. At that meeting, Donohoe told Goethe that she was an excellent banquet server and bartender. [39] ¶ 40. He also told her that her performance in that role had led him to believe that she would excel at the beverage cart and clubhouse bar, but that he questioned her ability to multitask. [39] ¶ 40. Donohoe told Goethe that she would no longer work those assignments, because of her poor work ethic, her failure to engage customers, her inadequate sales, and the customer complaints he had received about her. [39] ¶ 41. Before she left the meeting, Donohoe and Hopkins told Goethe that if she had any complaints, she could submit them in writing. [39] ¶ 42. Over the next two days, Goethe submitted written statements to Donohoe and to the Village's Human Resources Department complaining of race discrimination. [39] ¶ 43. She also filed a charge of

---

[4] Goethe does not remember giving that explanation, but testified that the mobile device often failed to work for some reason or other. [39] ¶ 35.

discrimination with the Equal Employment Opportunity Commission on August 26, 2014. [39] ¶ 43.

In July, Donohoe relieved the banquet coordinator of her duties scheduling banquet employee shifts, and assumed those duties himself. [39] ¶ 53. He stated in his affidavit that several banquet servers and bartenders had complained to him that the banquet coordinator had not been assigning shifts fairly. [39] ¶ 53. Upon review of the schedule, he determined that the coordinator had been assigning more shifts to Goethe than to other employees because of their personal friendship. [39] ¶ 53. Donohoe took over scheduling duties (with Durkin's input) and, starting with the August 2014 schedule, tried to assign each employee an equal number of shifts. [39] ¶ 53. Donohoe and Durkin stated that they also considered staff availability and requests for time off, the size of the event, labor costs, and special requests from event hosts. [39] ¶ 56. Donohoe's involvement ended in July 2015. [39] ¶ 55.

Donohoe also decided that the banquet coordinator's scheduling practices, such as granting too many staff requests for time off, led to staff shortages during events. [39] ¶ 71. As a result, Donohoe tried staffing events with temporary workers from an outside staffing agency to serve as banquet servers, beginning in August 2014. [39] ¶ 71. Banquet bartender shifts, however, were reserved for Goethe and her Glenwoodie coworkers. [39] ¶¶ 71–73. For a period of two to three weeks in September and October, the Village relied upon the outside staffing company exclusively for banquet server positions, and Goethe was not called in for seventeen days, prompting her to call a Village administrator to complain. [39] ¶¶ 73, 75.

Despite these changes to the August schedule, Goethe worked more hours in August than in July, partly due to the fact that her hours as a banquet bartender and server depended on the number of banquets held at Glenwoodie in any given month, which in turn depended on the season. [39] ¶ 54. Her hours continued to fluctuate each month; she sometimes worked more total hours than her fellow banquet bartenders and servers, and sometimes fewer. [39] ¶¶ 63–67, 69, 72–74. In October, when she went without work for seventeen days, she worked one hour less than one other banquet server, and seven hours less than another. [39] ¶¶ 64, 67. And for most months between August 2014 and 2015, Goethe worked more shifts as a banquet bartender than the others, including Durkin, though this did not always equate to more hours overall. [39] ¶ 69. Goethe's total monthly hours from December 2013 through August 2015 are below:

| Month | Total Hours Worked |
|---|---|
| December 2013 | 60.50 |
| January 2014 | 14.25 |
| February 2014 | 12.25 |
| March 2014 | 44.25 |
| April 2014 | 61.75 |
| May 2014 | 95.50 |
| June 2014 | 59.50 |
| July 2014 | 41.00 |
| August 2014 | 42.50 |
| September 2014 | 21.00 |
| October 2014 | 31.50 |
| November 2014 | 33.50 |
| December 2014 | 44.00 |
| January 2015 | 18.25 |
| February 2015 | 38.00 |
| March 2015 | 41.00 |
| April 2015 | 24.00 |
| May 2015 | 22.75 |
| June 2015 | 36.00 |

| July 2015 | 34.00 |
|-----------|-------|
| August 2015 | 39.50 |

[39] ¶ 54.

A few other incidents are worth mentioning. On July 19, 2014, Goethe worked a shift as a banquet bartender for an event with over 200 guests. [39] ¶ 47. Goethe arrived on time, and Donohoe instructed her to set up the bar before the event began. [39] ¶ 48. Durkin and another coworker had been scheduled to tend bar alongside Goethe but refused, so Donohoe assigned an inexperienced individual to assist Goethe until another experienced bartender could arrive. [39] ¶ 50. Later, unaware that it was an open-bar event, Goethe attempted to collect payment from a guest, forcing the event host to intercede. [39] ¶ 49. The host then complained to Donohoe because Goethe had been telling guests that the bar had run out of certain drinks, and Donohoe believed that Goethe had not properly stocked the bar. [39] ¶ 51. In October 2014, Donohoe told Goethe that he was going to give her and a coworker written reprimands for failing to clean the bar area and for leaving work without permission. [39] ¶ 76. Before he could give her the document, however, Goethe excused herself and left work, believing she was having a panic attack. [39] ¶¶ 76–77. Donohoe ended up never giving Goethe that reprimand in writing, but during his time at Glenwoodie, he issued written reprimands for similar offenses to other employees who, to his knowledge, had never made complaints of discrimination. [39] ¶¶ 77–78. Finally, on July 22, 2015, Goethe met with Donohoe and another manager to complain about getting fewer hours than some temporary workers. [39] ¶ 79. At this meeting, Donohoe shared with her some of his concerns

about her performance, including her failure to communicate effectively with her coworkers, her slow pace, and her attitude. He told her that he would consider increasing her hours after she completed a self-evaluation and he had a chance to observe her and reevaluate her work ethic. [39] ¶ 79. He left Glenwoodie shortly thereafter. [39] ¶ 6.

## III.    Analysis

The Village argues that Goethe waived her claims and any arguments opposing its motion, because she did not file a memorandum of law or a statement of material facts in support of her motion for summary judgment, and because she did not file a memorandum of law addressing the Village's arguments. Goethe has forfeited any arguments she did not make in support of her motion or in response or reply to the Village's brief. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 & n.1 (7th Cir. 2011). But Goethe did address some of the Village's arguments in her responses to the Village's statements of fact. Because she is proceeding *pro se*, and because her arguments are not so voluminous or confusing as to be prejudicial to the Village, those arguments will not be disregarded.

### A.    Race Discrimination

In analyzing a motion for summary judgment on an employment discrimination claim, the legal standard is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence

must be considered as a whole. *Id.* The Village articulates its argument using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is a "means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under the *McDonnell Douglas* burden-shifting analysis, "a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). If she establishes a *prima facie* case, then "the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext." *Id.* (internal citation omitted).

Goethe is African American, and she believes her managers removed her from the beverage cart and clubhouse bar assignments because of her race. It is undisputed that she is a member of a protected class, and the Village concedes that her removal from those assignments constituted an adverse employment action. But the Village argues that Goethe cannot establish a *prima facie* case, because she

cannot show that she met the Village's legitimate job expectations or that similarly situated employees of a different race received more favorable treatment.

Goethe argues that she was always pleasant and courteous to customers when she worked at the clubhouse bar, and that she never received any verbal or written reprimands about her performance prior to her June 1 meeting with Donohoe, Durkin, and the Village Trustee. But whether she "had notice of her transgressions, whether termination was an extreme response to them, and whether [the defendant employer] followed its own progressive disciplinary procedures are irrelevant to the issue of whether [plaintiff] was meeting the firm's legitimate expectations." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 n.3 (7th Cir. 2007). Goethe provides no evidence to dispute Donohoe's and Durkin's assertions that they received customer complaints about her, that she ignored customers when she received personal visitors, that she let dirty dishes pile up on the tables, that she took too long to ring up sales, or that she was unable to multitask. She admits that she had difficulty using the cash register, blaming its "outdated and problematic" software. [39] ¶ 16. Goethe also admits in her response that customers complained about her performance operating the beverage cart on multiple occasions, and that she had arrived late to work on May 30. And she does not dispute that on May 31, she failed to properly account for her sales or her inventory and did not accept any credit card transactions. Based on the evidence in the record, Goethe cannot show that she met the Village's legitimate expectations.

Goethe also cannot establish that any similarly situated individuals of a different race received more favorable treatment while working the beverage cart or clubhouse bar shifts. "An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane*, 480 F.3d at 540 (citing *Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002)). Goethe does not identify any other employee, regardless of race, who worked those shifts and was not sent home early from an event when multiple attendees complained. And there is no evidence in the record that any other employee with the same performance history as Goethe remained in the rotation for clubhouse bar or beverage cart assignments. No reasonable jury could find that the similarly situated requirement has been met.

Finally, even if Goethe could establish a *prima facie* case, she cannot show that the Village's reasons for sending her home early on May 30 and for removing her from clubhouse bar and beverage cart assignments were pretextual. "To show pretext, [a plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons." *Fane*, 480 F.3d at 541 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was

accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). On June 1, 2014, when Donohoe told Goethe that he was removing her from the beverage cart and clubhouse bar assignments, he explained his reasoning. Goethe's only argument that this explanation was dishonest is that her managers failed to contemporaneously document their concerns. But it is undisputed that, in the one- to two-month period in which she was assigned to the clubhouse bar and beverage cart, Goethe's managers found fault with her performance and received complaints about her from customers. It is also undisputed that on her final two days working the beverage cart, she was late to work, multiple golfers complained about her, she confronted some of those golfers, she limited customers to cash payments, and she failed to properly account for her sales. Whether Donohue adhered to the Village's own disciplinary and documentation policies is irrelevant. He provided non-discriminatory reasons for his decision, those reasons were based on undisputed facts, and Goethe provides no evidence to suggest that the stated reasons were pretextual.

While the Village used the *McDonnel Douglas* framework, it should be noted that "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *David*, 846 F.3d at 224. The central question remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *Id.* Goethe believes that her managers treated her unfairly by limiting her to less desirable shifts, and that their actions were motivated by an unspoken racial bias. But she concedes that she was not a model

employee, and that nobody from the Village has ever made a derogatory comment about her race. [39] ¶ 11. Goethe does not provide evidence that race played a role in any decision made by her supervisors, and her belief that it did is based on nothing more than her own suspicion.[5] That suspicion alone is not sufficient to defeat summary judgment. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.") (quoting *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006)).

Given Goethe's history of poor performance and customer complaints, the dearth of similarly situated employees that received more favorable treatment, and the lack of any overt racial animus or any evidence that Goethe's race motivated the Village's actions, there does not exist sufficient evidence to support a jury verdict of intentional discrimination. With respect to that claim, Goethe's motion for summary judgment is denied, and the Village's motion is granted.

### B.    Retaliation

Goethe believes that after she complained of race discrimination, her managers retaliated against her by removing her from the beverage cart and clubhouse bar assignments, by making her tend bar alongside an inexperienced

---

[5] Her suspicion seems to have waned since she first complained of race discrimination. She says that she believed at the time of her removal from the beverage cart that race played a role, but suggests that she alleged race discrimination in her lawsuit only because she had alleged it in her complaint to the Equal Employment Opportunity Commission. [39] ¶¶ 10, 12–13.

individual at an event, by telling her that her work ethic needed to be reevaluated in response to a complaint that certain temporary workers were working more hours than her, by threatening to issue her a written reprimand for failing to mop the floor, and by reducing her hours. The Village again frames its argument using the burden-shifting approach, under which Goethe must show that (1) she engaged in protected activity (2) she suffered an adverse employment action, (3) she met her employer's legitimate expectations, and (4) she was treated less favorably than similarly situated employees who did not engage in protected activity. *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). If she can establish a *prima facie* case, the Village must articulate a non-discriminatory reason for the adverse employment action, after which Goethe bears the burden of showing "that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012). Again, the essential question remains: "could a reasonable trier of fact infer retaliation?" *Poullard*, 829 F.3d at 856 (quoting *Castro v. DeVry University, Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)).

The Village concedes that Goethe engaged in statutorily protected activity when she submitted written complaints to the Village after her June 1, 2014 meeting, and when she filed a charge of discrimination with the Equal Employment Opportunity Commission on August 26, 2014. But it argues that, with respect to every instance of retaliation that Goethe alleged, she does not set forth evidence raising a genuine issue of material fact either that she met the Village's legitimate

expectations, that she suffered an adverse action, that similarly situated employees were treated more favorably, or that the Village's stated reasons for its actions are pretext.

Goethe's removal from the clubhouse bar and beverage cart assignments does not constitute retaliation, primarily because her removal preceded her complaints of race discrimination. Donohoe sent her home early on May 30, decided at the end of May 31 that he would remove her from those assignments, and told her of his decision on June 1. It is undisputed that she did not submit a complaint about race discrimination until after the June 1 meeting.[6] Also, as explained above, she had not met the Village's legitimate expectations, she does not identify any similarly situated employees who received more favorable treatment, and she offers no evidence to suggest that the Village's stated reasons for her removal were pretext.

The Village argues that several of the events that Goethe thinks are retaliatory do not constitute adverse employment actions as a matter of law. "In the retaliation context, the challenged adverse action need not be one that affects the terms and conditions of employment, but it 'must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Poullard*, 829 F.3d at 856 (quoting *Roney v. Illinois Dep't of Transportation*, 474 F.3d 455, 461 (7th Cir. 2007)). The Village argues that being assigned to a bartending shift with an inexperienced coworker on

---

[6] Goethe argues that she also complained to a Village administrator as soon as she was sent home on May 30, but she does not specify that she complained about race discrimination as opposed to unfair treatment in general, and she does not refer to any evidence to substantiate her assertion.

one occasion is at most a minor annoyance, but not significant enough to dissuade a reasonable employee in this context from making use of Title VII's remedial mechanisms. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.").

The Village makes the same argument with respect to the July 22, 2015 conversation in which Goethe requested more hours, and Donohoe responded by telling her that he would consider her request after she filled out a self-evaluation and he reevaluated her work ethic. It also argues that Donohoe's threat of issuing Goethe a written reprimand for failing to mop the floor does not constitute a materially adverse action. *See Poullard*, 829 F.3d at 856–57 (explaining that threats of unspecified disciplinary action do not constitute materially adverse actions, so long as they do not affect compensation, career prospects, or conditions of employment). In addition, it argues that this was not a selectively-enforced policy, as Donohoe issued written reprimands and threats of reprimands to other employees for the same offense, regardless of whether they made complaints to managers. Goethe does not meaningfully respond to any of those arguments, forfeiting her opposition, and the Village is correct—these actions would not dissuade an employee from engaging in protected activity.

Goethe focuses on the fact that she worked 95.5 hours in May 2014, but was scheduled for fewer hours per month after she complained of race discrimination. A

reduction in hours could constitute a materially adverse action. *See O'Neal v. City of Chicago*, 392 F.3d 909, 911–12 (7th Cir. 2004). And Goethe is correct that she never worked as many hours as she did in May. But she does not identify any similarly situated employee who was treated more favorably or provide any evidence to show that the change in her hours was retaliatory in nature. The undisputed facts make clear that, both before and after Goethe made her complaints, her scheduled hours were comparable to other banquet servers and bartenders who had not engaged in protected activity, and that her hours also depended on Glenwoodie's event schedule. When the Village began using an outside staffing company, all Glenwoodie employees were affected. The Village argues that employees who worked more total hours than Goethe in any given month did so because they had different responsibilities (*e.g.* management duties, or clubhouse bar or beverage cart assignments), or because of staff availability, labor costs, or special requests by event hosts. The Village also argues that it had legitimate, non-discriminatory reasons for changing its scheduling policy in August 2014—to schedule shifts fairly among the staff and to save money.

Goethe argues that the Village turned to the staffing company after she had complained of discrimination, and that Donohoe took over scheduling duties from the banquet coordinator to retaliate against Goethe, rather than to keep the schedule fair. But "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City*

*of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). And Goethe provides no evidence to support her theory that the change in her hours was motivated by Donohoe's retaliatory intent, rather than non-discriminatory reasons or reasons outside of her managers' control (*e.g.* the number of events held at the club in any given month). The timing is not suspicious in this context. Goethe bears the burden of establishing a *prima facie* case, and of showing that a genuine issue of material fact exists as to whether the Village's stated reasons for reducing her hours were pretextual. By failing to identify any similarly situated employees who received more favorable treatment, and by failing to submit evidence that the Village's stated reasons for reducing her hours were pretextual, she does not meet that burden.

Considering the evidence as a whole, including the incidents that do not constitute materially adverse actions,[7] a reasonable trier of fact could not infer retaliation. The record makes clear that Goethe's working relationship with her managers had room for improvement. But despite Goethe's suspicions, she cannot show a genuine issue of material fact that the Village acted in retaliation to her complaints of discrimination. With respect to the retaliation claim, Goethe's motion for summary judgment is denied, and the Village's motion is granted.

---

[7] Even conduct that is not actionable itself "may well be relevant evidence of retaliatory intent behind a more concrete adverse action." *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) (citing *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 688 (7th Cir. 2003)).

## IV.    Conclusion

The Village's motion for summary judgment, [32], is granted. Goethe's motion for summary judgment, [39], is denied. Enter judgment in favor of the Village and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: September 20, 2017